# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

April 5, 2016

Lyle W. Cayce
Clerk

No. 15-10095

BREGGETT A. RIDEAU, individually and as next friend of T.R.;
TERRENCE RIDEAU, individually and as next friend of T.R.;
PLAINSCAPITAL BANK,

> Plaintiffs - Appellants

v.

KELLER INDEPENDENT SCHOOL DISTRICT,

> Defendant - Appellee

Appeal from the United States District Court
for the Northern District of Texas

Before JOLLY, HAYNES, and COSTA, Circuit Judges.

GREGG COSTA, Circuit Judge:

The parents of a severely disabled child sued the school district where the child suffered abuse at the hands of his special education teacher. They asserted claims under federal disability law on behalf of their child, as well as claims of their own. A jury awarded a substantial verdict.

When parties appeal a case that went all the way to verdict—something we see less and less of these days—the arguments usually focus on the sufficiency of the evidence; evidentiary rulings such as the admission of expert testimony; jury instructions; and the amount of damages. Not so here. After trial, the school district challenged the verdict on a more fundamental basis: it

argued that the parents were never the proper parties to bring these claims in the first place.

In a private dispute such as this one, the question of who should sue typically has an obvious answer. But the answer was complicated here by a number of factors: the victim was a minor when the challenged conduct occurred but turned 18 by the time of trial; his disability rendered him incompetent even after he reached majority; a bank had been appointed to serve as his guardian; and that same bank oversaw a trust that paid for the minor's medical bills. The school district's argument that the bank should have brought the suit was not raised until after trial because evidence relating to the bank's role was not disclosed pretrial.

The district court held that the bank was the proper party and dismissed the claims rather than allow the bank to ratify the parents' actions pursuant to Federal Rule of Civil Procedure 17(a)(3). We are called upon to decide whether the parents were proper plaintiffs, and if not, whether the district court should have allowed ratification to correct the error.

## I.

Breggett A. Rideau and Terrence Rideau are the parents of T.R.[1] Due to encephalopathy induced by a tainted vaccine he received as an infant, T.R. has limited verbal and cognitive skills and is wheelchair bound.

In his early teen years, T.R. was a special education student at Keller Independent School District, during which time he was repeatedly mistreated by his special education teacher. The teacher's conduct ranged from petty slights (eating T.R.'s lunch) to dereliction of duties (not following key aspects of T.R.'s Individual Education Plan) to physical abuse (T.R. suffered a broken

---

[1] Although all three share the same last name, references to the Rideaus will refer to the parents.

No. 15-10095

thumb, a dislocated knee, and skull contusions in the teacher's care).  Due to his disability, T.R. could not tell his parents what was happening, although his physical injuries and regression in life skills signaled that something was terribly wrong.  The Rideaus lodged concerns with the school district.  To their shock, they learned that a classroom aide had reported misconduct by the special education teacher years before, but that nothing had been done to remove, discipline, or fire the teacher in question.

The Rideaus, individually and as next friends of T.R., filed this lawsuit against Keller.  The suit alleges claims under the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act of 1973 (Rehabilitation Act).  The Rideaus prevailed after an eight-day trial, and the jury awarded the following damages:

- $7,000 for T.R.'s past medical expenses;

- $320,000 for T.R.'s future home care;[2]

- $520,000 for T.R.'s physical pain and mental anguish;

- $3,000 for T.R.'s past physical impairment;

- $100,000 for Breggett Rideau's mental anguish; and

---

[2] The verdict form did not specify whether the medical expenses and future home care costs were being awarded to the Rideaus individually or to T.R. himself.  Whereas other awards were specifically identified as compensation for "Little T" (another name for T.R.), Breggett Rideau, or Terrence Rideau, the medical bills and home care were described as compensation for "plaintiffs."  In light of this flexible language not tied to particular individuals, the district court appeared to treat these damage awards as ones that could support entry of judgment in favor of either the parents in their individual capacities or in their names on behalf of T.R.  It did so when it addressed and rejected the parents' standing to recover these awards in either capacity.  In light of the general wording of the verdict form on these questions that could support entry of judgment in either scenario as legally permissible, we will evaluate the past medical expenses (all of which were incurred when T.R. was still a minor) in terms of whether that claim belongs directly to the Rideaus as parents.  *See generally Sax v. Votteler*, 648 S.W.2d 661, 666 (Tex. 1983) (stating that minors may not recover medical expenses for which their parents were legally responsible).  We will evaluate the future home health care expenses in terms of whether T.R. possesses that claim, and if so, whether his parents had capacity to assert it as next friend given his incapacity.

3

No. 15-10095

- $50,000 for Terrence Rideau's mental anguish.

Throughout the litigation, everyone recognized that T.R. lacked the ability to prosecute his claims, primarily due to his disability though also because he was a minor when the lawsuit began. The Rideaus' ability to bring claims on behalf of their son did not come into question until after trial. Four days after the jury rendered its verdict, Keller ISD moved for leave to conduct additional discovery relating to whether the Rideaus had "standing." The impetus for the motion was Keller ISD's receipt of documents the week before trial that indicated that some of T.R.'s expenses had been paid by a trust account in his name.[3] The district court granted the motion.

The resulting discovery revealed that in July 2001—when T.R. was six years old—the Rideaus filed an application in probate court to create a guardianship management trust for the benefit of T.R (the Trust). The Trust was funded by the settlement proceeds of a lawsuit relating to the tainted vaccine T.R. received as an infant and was intended to provide support and maintenance for T.R. for the remainder of his life. The probate court originally appointed Bank of America as trustee in August 2001. Bank of America served in that role until August 2010, when PlainsCapital became successor trustee. As trustees, Bank of America and PlainsCapital paid for T.R.'s medical care, therapy, and caregivers.

At the same time that Bank of America became trustee, it was also appointed guardian of T.R.'s estate. It was discharged from that role in 2004. It appears that no successor guardian was appointed from 2004 until August 2010, four months before the filing of this lawsuit. At that time, the Trust and Breggett Rideau procured the appointment of PlainsCapital as successor

---

[3] Based on the eleventh-hour nature of the production, Keller ISD moved to continue the trial date and reopen discovery. The district court refused to disturb the trial setting but forbade the use of documents at trial that were not timely disclosed in discovery.

4

guardian "to engage the services of attorneys to pursue certain claims of the Ward against the Keller ISD for bodily injury, pain and suffering." The probate court's order provided that PlainsCapital was "granted full authority over [T.R.] with all powers to act on [T.R.]'s behalf as authorized under the Texas Probate Code . . . ."

After post-trial discovery concluded, and in large part on the basis of the above discovered facts, Keller ISD moved to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). Keller ISD maintained that the Rideaus lacked Article III standing to bring the claims because (1) the Trust alone had standing to recover for costs paid by the Trust, such as medical and caregiver expenses; (2) as guardian of T.R's estate, PlainsCapital should have brought T.R.'s personal injury claims; and (3) the Rideaus could not recover individually under the Rehabilitation Act or the ADA. Meanwhile, the Rideaus and PlainsCapital filed a joint motion for ratification under Rule 17 of the Federal Rules of Civil Procedure. In that motion, the Rideaus and PlainsCapital contended that to the extent PlainsCapital is the proper party, it should be able to ratify the actions taken by the Rideaus and agree to be bound by the judgment.

In a combined order, the district court granted Keller ISD's motion to dismiss for lack of jurisdiction and denied the Rideaus and PlainsCapital's motion for ratification. The court broke down the Rideaus' claims into three categories: (1) claims for T.R.'s medical expenses and caregiver costs; (2) claims for T.R.'s injuries, specifically past physical pain, mental anguish, and physical impairment; and (3) claims for the Rideaus' mental anguish. The court concluded that only the Trust had standing as it related to the first category of claims because it had paid those expenses and was obligated to continue doing so. As for the second category, the court determined that the Rideaus did not have capacity to file suit on behalf of T.R. for his injuries because PlainsCapital

was the guardian of T.R.'s estate.  Finally, the court held that the Rideaus did not have standing to assert claims for their own mental anguish.

Because the second of these problems would be cured by allowing PlainsCapital to ratify the Rideaus' actions, the district court then considered the Rideaus' and PlainsCapital's Rule 17(a) motion.  It determined that ratification was improper because (1) the Rideaus' decision to file a lawsuit without PlainsCapital was not an understandable mistake and (2) ratification would prejudice Keller ISD.

## II.

Keller ISD attempted to shoehorn all of its post-trial arguments into the doctrine of constitutional standing.  Perhaps it did so because classifying them as jurisdictional arguments would allow them to be raised at any stage in the case.[4]  As discussed below, we conclude that these issues do not go to Article III standing.  But whether they are questions of standing properly raised in a Rule 12(b)(1) motion or questions about capacity or the remedies available under a certain cause of action that are better suited for a Rule 12(b)(6) motion, our standard of review is de novo.  *Little v. KPMG LLP*, 575 F.3d 533, 540–41 (5th Cir. 2009); *see also Gulf Guar. Life Ins. Co. v. Conn. Gen. Life Ins. Co.*, 304 F.3d 476, 486 (5th Cir. 2002) (explaining that we are "not restricted to ruling on the district court's reasoning, and may affirm a district court's grant of a motion to dismiss on a basis not mentioned in the district court's opinion").

Our review of the district court's ruling on the Rule 17(a) motion is more deferential.  We review the decision to disallow ratification for abuse of discretion.  *Wieburg v. GTE Sw. Inc.*, 272 F.3d 302, 308 (5th Cir. 2001).

---

[4] In fact, the classification of the defenses does not affect Keller ISD's ability to raise them at such a late stage, given the late production of the documents that gave rise to these issues.

No. 15-10095

## III.

We first address the district court's holding that the Rideaus lacked Article III standing to directly seek past medical expenses and to seek future home care expenses on behalf of T.R.

Keller ISD's standing challenge focused on the most basic element of the Article III requirement: an injury in fact. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The district court correctly rejected the standing argument with respect to the damages sought for T.R.'s pain and suffering. It recognized that the question of who could pursue those damages on T.R.'s behalf is a capacity problem, not a standing problem. But it determined that neither the Rideaus nor T.R. possessed constitutional standing to recover medical expenses and future home care costs as those expenses have been and will be paid out of T.R.'s Trust. As a result, it concluded that only PlainsCapital as Trustee could sue to recover medical expenses that have been borne or will be borne by the Trust. (We will soon address the guardianship, which is a separate issue—despite PlainsCapital serving in both roles—and raises more problems than the Trust.)

We first address the $7,000 in past medical expenses that we consider as a direct claim asserted by the parents. The common law in many states, including Texas, grants parents the negligence cause of action for recovering a minor's medical expenses. *See, e.g.*, *Sax v. Votteler*, 648 S.W.2d 661, 666 (Tex. 1983). We may consider that common law rule in determining who may assert a claim for a minor's compensatory damages under the ADA or Rehabilitation Act, just as other courts have looked to the common law to determine when federal civil rights claims survive the death of the person aggrieved. *See Hutchinson ex rel. Baker v. Spink*, 126 F.3d 895, 898 (7th Cir. 1997) (ADA); *Slade v. U.S. Postal Serv.*, 952 F.2d 357, 360 (10th Cir. 1991) (Title VII). And the underlying rationale for the common law rule—that parents are legally

7

responsible for a minor's medical expenses—at a minimum establishes that the Rideaus have suffered an economic injury for Article III standing purposes. Indeed, despite the existence of the Trust, the medical bills included in the record are addressed to Breggett Rideau as the obligated party. For the reasons explained more fully below, the existence of a potential third-party payor in the form of the Trust does not deprive the Rideaus of standing that would otherwise exist as a result of incurring that obligation.

We also do not see a standing impediment to the Rideaus seeking future home care expenses under T.R.'s name as the injured party. The standing inquiry for these damages is considered from T.R.'s perspective as he had reached the age of majority by the time of trial. *See supra* footnote 2. The fortuity that T.R. has a trust as a result of his earlier injury does not mean he will not suffer additional economic harm years later as a result of injuries incurred while attending school. In a great number of personal injury cases, an injured will have a third party paying medical bills or other costs. A private or public insurer is the most common example. Despite the ubiquity of insurance, we are aware of no court holding that a party lacks constitutional standing to bring suit in diversity cases governed by the laws of states like Texas that do not allow direct suits by insurers. The collateral source rule embodies the notion that even an insured who has paid for his own insurance is harmed by the actions of a tortfeasor. *See Davis v. Odeco, Inc.*, 18 F.3d 1237, 1243 n.21 (5th Cir. 1994) (explaining that "plaintiffs who pay their own insurance premiums" would "derive no benefit from" that insurance if tortfeasors could "set off compensation available to plaintiffs through collateral sources" and "might be left exposed to other misfortunes once their insurance

coverage was depleted by the tortfeasors' negligence").[5]

For purposes of establishing an Article III injury, the existence of the trust should not create any more of an impediment than the existence of insurance. To make another comparison, assume T.R. was fortunate enough to have a wealthy relative leave a trust for his benefit. Would the availability of that money to pay medical bills mean T.R. is not made worse off financially when a tortfeasor causes him to incur such expenses? Of course not. Just as the beneficiary of a trust established by a rich relative suffers an injury when trust funds are depleted to pay for damages inflicted by a negligent actor, so too will T.R. suffer an economic injury when the Trust that holds the money he was awarded as damages for a tainted vaccine pays for additional damages caused by the school district.[6]

The district court relied upon a Texas intermediate appellate decision—*Interfirst Bank-Houston, N.A. v. Quintana Petroleum Corp.*, 699 S.W.2d 864 (Tex. App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.)—to hold that the Trust and not T.R. was hurt by these marginal increased costs. *Interfirst* does not control. In that case, the plaintiff was a beneficiary of a trust and sought to bring a claim against a third party related to property that allegedly should have been conveyed to the trust. *See* 699 S.W.2d at 874–75. The Texas appellate court noted that "[i]t is the right and responsibility of the testamentary trustee to assure that all property willed into trust is properly

---

[5] We recognized in *Davis* that subrogation is an exception to the collateral source rule. *See* 18 F.3d at 1243 n.21 (citing *Thomas v. Shelton*, 740 F.2d 478, 484–85 (7th Cir. 1984)). That is, to the extent that a third-party payor subrogates to the rights of the injured party, the tortfeasor's liability to the injured party is diminished accordingly. Keller ISD has not argued that the Trust subrogated to T.R.'s claim for future home care costs.

[6] The damages awarded by the jury had to be compensation for future home care expenses he will incur as a result of Keller ISD's actions, not as a result of his pre-existing encephalopathy. Indeed, the school district argued at trial that there will be no additional expenses, but the jury disagreed.

conveyed by the executors of the settlor's estate." *Id.* at 874. *Interfirst* thus demonstrates the limits of a trust beneficiary's ability to bring suit for injury to the trust or trust property. This is long-standing, hornbook law of trusts. *See* George Bogert et al., THE LAW OF TRUSTS AND TRUSTEES § 869 (database updated September 2015) (stating general rule that "right to sue" for "wrongful interference" with trustee's powers of "possession . . ., management and control" of trust property "vests in the trustee;" "the beneficiary is not eligible to bring or enforce these causes of action which run to his trustee"); RESTATEMENT (THIRD) OF TRUSTS § 107 cmt b (2012) ("As holder of the title to trust property (including choses in action), and as the representative of the trust and its beneficiaries, the trustee is normally the appropriate person to bring (and to decide whether to bring) an action against a third party on behalf of the trust. Except [in limited circumstances], a beneficiary has no standing to sue a third party on behalf of the trust."). By contrast, neither *Interfirst* nor any aspect of Texas trust law that we have seen provides that a trustee owns a beneficiary's legal claims against a third party when those claims arise independently from the trust and trust property.

Economic harm in the form of past and future medical expenses is (along with the pain, suffering, and mental anguish that T.R. suffered) the bread-and-butter injury for private-law causes of action in which constitutional standing is rarely an issue. *See Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 642 (2007) (Souter, J., dissenting) ("In the case of economic or physical harms, of course, the 'injury in fact' question is straightforward."). The existence of a third-party payor in the form of a trust created by a prior tortfeasor does not deprive T.R. of the injury that would otherwise exist. We thus find that T.R. had standing to seek the home care expenses recovered on his behalf.

No. 15-10095

## IV.

## A

Although the complications about party status mentioned at the outset do not result in a standing problem, some of them do create a problem of capacity with how this case was brought.[7]  When the suit was filed, T.R. was both a minor and incompetent; the latter obstacle still existed at the time of trial.

That poses no capacity problem for the past medical expenses the Rideaus recovered on their own behalf.  They are obviously the proper parties to seek claims they possess.

But the Rideaus recognized T.R.'s lack of capacity to recover the claims he would otherwise possess—those for future home care expenses, physical pain and anguish, and impairment—by suing in their name on his behalf.  We agree with the district court that PlainsCapital, as guardian, should have done so instead.

Under Federal Rule of Civil Procedure 17(b)(3), the Rideaus' capacity to sue or be sued on behalf of T.R. is determined by the law of the state where the court is located—in this case, Texas.  FED. R. CIV. P. 17(b)(3); *see Slade v. La. Power & Light Co.*, 418 F.2d 125, 126 (5th Cir. 1969) (holding that if a state-appointed guardian lacks capacity to sue under state law, he lacks the capacity in federal court under Rules 17(b) and (c)).  The Rideaus attempt to avoid Texas capacity law by resorting to a different section of the Rule—17(c)—which describes who "may" sue on behalf of minor or incompetent persons.  FED. R.

---

[7] As a leading commentator on Texas law has noted, the intermingling of standing and capacity issues is not uncommon.  *See* William V. Dorsaneo, III, *The Enigma of Standing Doctrine in Texas Courts*, 28 REV. LITIG. 35, 65 (2008) ("[I]f the claim actually belongs to one person, . . . but the action is filed by another person, . . . the issue should be whether the claimant is authorized to prosecute the claim on behalf of the actual owner.  This is a waivable capacity problem, not a jurisdictional standing problem.").

No. 15-10095

CIV. P. 17(c). The Rideaus argue that at all times they acted as T.R.'s "general guardian[s]" under Rule 17(c)(1)(A) and had authority under federal law to sue on that basis. But courts, including ours, have read Rule 17(c) in conjunction with Rule 17(b), which mandates the use of state law in determining a representative's capacity to sue. *See Slade*, 418 F.2d at 126; *see also* 6A Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 1571, at 679 (3d. ed. 2010) ("A close reading of Rule 17(c) discloses that although no reference is made to state law, the language is sufficiently permissive to accommodate the application of state law in situations in which that is called for by Rule 17(b).").

What does Texas law say about who has capacity to sue on T.R.'s behalf? "The guardian of the estate of a ward appointed in this state may commence a suit for . . . the recovery of personal property, debts, or damages . . . ." TEX. ESTATES CODE ANN. § 1151.104(a)(1).

The Rideaus contend they retained capacity despite the appointment of PlainsCapital as guardian prior to the filing of the lawsuit because this Estate Code provision does not say that a guardian's right to bring suit is exclusive. Although there is textual support for the Rideaus' position, Texas case law rejects it. Several Texas intermediate courts have, in well-reasoned opinions, determined that Section 1151.104's predecessor statute—Section 773 of the Probate Code[8]—is an exclusive grant of representational authority. *See In re Archer*, 203 S.W.3d 16, 21 (Tex. App.—San Antonio 2006, pet. denied) ("Generally speaking, only the guardian of the ward's estate may bring a lawsuit on behalf of a ward."); *Brown v. Midland Nat. Bank*, 268 S.W. 226, 228 (Tex. Civ. App.—El Paso 1924, writ ref'd) ("In the case of a minor without a

---

[8] The Estates Code reorganized and renumbered the Probate Code "without substantive change." TEX. ESTATES CODE ANN. § 21.001(a).

12

guardian he can [sue] by next friend. But, in the case of a minor with a legally appointed, qualified, and acting guardian of his estate, there is no other proper person through whom he can act in the enforcement of rights of action against third persons . . . ."); *see also Howell v. Thompson*, 2011 WL 664763, at *2 (Tex. App.—Eastland Feb. 24, 2011, no writ) ("[A]s a general rule, when a person has been declared to be incapacitated and a guardian has been appointed, only the guardian of the ward's estate may bring a lawsuit on behalf of the ward."). That these courts qualify their assessment of the law with the use of the word "generally" is perhaps a reference to Texas Rule of Civil Procedure 173.2, which requires a court to appoint a guardian ad litem for a party represented by a next friend or guardian if "the next friend or guardian appears to the court to have an interest adverse to the party . . . ." TEX. R. CIV. P. 173.2(a)(1). There is no hint that PlainsCapital has any interest adverse to T.R.

*In re Archer* illustrates how Section 1151.104 limits who may represent an incapacitated ward. In that case, a niece filed a malpractice suit on behalf of her incapacitated, adult uncle. *In re Archer*, 203 S.W.3d at 17. The niece alleged that she could sue because her uncle's temporary guardian had refused to prosecute the claims. *Id.* at 21. The court disagreed and affirmed the trial court's dismissal of the claim, noting that "a relative like [the niece] should not (absent showing that the guardian has a conflict of interest with the ward) be able to bring a lawsuit on the guardian's behalf, thereby circumventing the bonded guardian who owes a fiduciary duty to the ward." *Id.* at 22. To allow the niece to bring suit, the court noted, "conflicts with the Probate Code, which allows only a guardian to bring suit on behalf of a ward and which creates a fiduciary relationship between the guardian and the ward." *Id.* at 24.

The Rideaus challenge the applicability of *In re Archer* to this case. They note that the incapacitated individual there was an adult, while T.R. was a minor when this suit was brought (but not by the time of trial). They also

highlight that they as parents are in a closer familial relationship to their son than the niece to the uncle in *In re Archer*. But these factual distinctions do not persuade us that we can avoid following *In re Archer,* especially in light of the way other Texas courts have read the statute. As a federal court making an *Erie* guess in the absence of guidance from the Supreme Court of Texas, we must defer to the prevailing view of the state intermediate courts, even more so if that view is uniform, "unless convinced by other persuasive data that the highest court of the state would decide otherwise . . . ." *Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 229 (5th Cir. 2010) (internal quotation marks and citation omitted).

We find additional support for the holdings of these Texas intermediate appellate courts in the text of Texas's "next friend" provision. Texas Rule of Civil Procedure 44 provides that "[m]inors . . . who have no legal guardian may sue and be represented by 'next friend' under the following rules . . . ." TEX. R. CIV. P. 44. If "next friend" capacity were available even in the presence of a legally appointed guardian, language in Rule 44 limiting the rule to minors "with no legal guardian" would be superfluous.

Following Texas law, we thus conclude that PlainsCapital owed a fiduciary duty to T.R. Absent a showing of conflict, the Rideaus could not circumvent PlainsCapital by filing suit on T.R's behalf.

**B**

Although we just definitely resolved the capacity question, the answer was not obvious. Finding that the Rideaus lacked capacity to assert T.R.'s claims required us to determine whether Texas law or Federal Rule 17(c) applied and then interpret a Texas statute in light of intermediate appellate authority and a Texas procedural rule. And we resolved the question of capacity only after considering whether the Trust created a separate obstacle to the Rideaus' filing suit.

No. 15-10095

Federal Rule 17 recognizes that, as in this case, questions about who may prosecute a case may not be simple and provides for the possibility of relief when a reasonable mistake is made. Under Rule 17(a)(3), a court "may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action." FED. R. CIV. P. 17(a)(3). That unequivocal command indicates that ratification is mandatory when timely sought. *See* 6A Wright & Miller § 1555, at 570 ("A literal interpretation of Rule 17(a)(3) would make it applicable to every case in which an inappropriate plaintiff has been named."). But our court and others have interpreted the Rule in light of the Advisory Committee Notes, which state that "this provision was added 'simply in the interests of justice' and 'is intended to prevent forfeiture when determination of the proper party to sue is difficult or when an understandable mistake has been made.'" *Wieburg*, 272 F.3d at 308 (quoting FED. R. CIV. P. 17(a) Advisory Committee Notes, 1966 Amendment). Ratification thus is "applicable only when the plaintiff brought the action in her own name as the result of an understandable mistake, because the determination of the correct party to bring the action is difficult." *See Wieburg*, 272 F.3d at 308 (collecting cases).

This judicial "gloss" on the Rule 17(a)(3) standard is not meant to detract from its permissive text. *See Magallon v. Livingston*, 453 F.3d 268, 273 (5th Cir. 2006) (noting this gloss on the mandatory text, but still finding district court abused its discretion in disallowing substitution when Consul General of Mexico had mistaken "belief, not wholly unfounded" that individual on whose behalf it was suing was not competent). Instead, it is aimed at cabining Rule 17(a)(3) to its intended purpose: the "avoid[ance of] forfeiture and injustice when an understandable mistake has been make in selecting the party in whose name the action should be brought . . . ." 6A Wright & Miller § 1555, at

565. Accordingly, we have reversed for abuse of discretion when a district court either fails to consider whether a plaintiff's mistake is understandable, *Wieburg*, 272 F.3d at 308, or disregards a given "reasonable explanation" for the mistake, *Magallon*, 453 F.3d at 273.

The district court found no understandable mistake in the Rideaus' failure to name PlainsCapital as a party in this case. It emphasized that the Rideaus had provided "**no explanation**"[9] for the omission and stated that the Rideaus "should have had no difficulty identifying PlainsCapital as the correct party to bring the action" in light of the fact that "the Rideaus sought out and obtained an order from the probate court authorizing the bank to file suit against [Keller ISD] on T.R.'s behalf."

We cannot reconcile the district court's determination that the Rideaus gave "no explanation" for prosecuting T.R.'s claims in their own names with the Rideaus' steadfast and consistent position that the appointment of PlainsCapital as successor guardian did not deprive them of the capacity to sue as next friends and natural guardians of T.R. They articulated this position in their motion for ratification, in their opposition to Keller ISD's post-trial Rule 12(b)(1) motion to dismiss, and in their briefing to this court. Indeed, it has always been the Rideaus' primary argument that Section 1151.104 of the Estates Code does not give PlainsCapital exclusive authority to sue on behalf of T.R. By contrast, PlainsCapital seeking ratification was a fallback position, asserted in belt-and-suspenders fashion in case the Rideaus were wrong about Texas law.

It turns out they were, as explained above, wrong. But Rule 17(a)(3) ratification does not depend on the absence of any mistake; rather, ratification is proper when the mistake is understandable. The Rideaus' reading of Section

---

[9] Emphasis original to the district court's order.

No. 15-10095

1151.104 is not "wholly unfounded." *See Magallon*, 453 F.3d at 273. We took up pages parsing statutes, rules, and case law to arrive at the answer. Even PlainsCapital—a bank with guardianship experience—apparently shared the Rideaus' understanding of Section 1151.104, as it pre-approved the filing of the lawsuit by the Rideaus without insisting on being named as T.R.'s representative.

Of course, the consistency of the Rideaus' position tells us nothing about its genuineness. And we are mindful that the district court has the better perch for gauging the credibility of the parties before it. But the district court did not make the factual finding that the Rideaus' "error" was no error at all. Instead, the district court faulted the Rideaus for providing **"no explanation"** for their choice of party, claiming that the right party to sue was made apparent by the appointment of PlainsCapital as successor guardian. In other words, the district court appeared to accept that a mistake was made but did not accept that it was understandable.

The court's finding of no understandable mistake cannot withstand even deferential scrutiny. The Rideaus did provide an explanation for PlainsCapital's omission: they believed that they too could bring their son's claims. A good-faith, nonfrivolous mistake of law triggers Rule 17(a)(3) ratification, joinder, or substitution. *See Scheufler v. Gen. Host Corp.*, 126 F.3d 1261, 1270 (10th Cir. 1997) (joinder properly allowed when failure to include real parties in interest "was the result of a mistake as to the legal effectiveness of [assignment] documents"); *Link Aviation, Inc. v. Downs*, 325 F.2d 613, 614–15 (D.C. Cir. 1963) (lawsuit filed in name of insured rather than fully subrogated insurance company—the "only real party in interest" according to a 1949 Supreme Court case—was "not so lacking in validity as to furnish no support for a motion to bring it into compliance with Rule 17(a)"); *see also Unzueta v. Steele*, 291 F. Supp. 2d 1230, 1234 (D. Kan. 2003) (permitting

17

No. 15-10095

substitution when delay in seeking substitution was caused by "mistake as to the legal authority . . . extended by the order of special administration [in decedent's probate case]"). That the effect of this mistake, in the absence of ratification, will be felt by T.R.—an incapacitated individual who should not be expected to understand the complicated capacity issue previously outlined— further sets this case apart from those in which a mistake was found not understandable. *Compare Lans v. Digital Equipment Corp.*, 252 F.3d 1320, 1324, 1328–29 (Fed. Ct. 2001) (ratification properly denied when individual who brought the patent infringement claim had assigned the patent to a corporation he controlled and there was no understandable mistake in naming the individual rather than the corporation as plaintiff); *see also Zurich Ins. Co. v. Logitrans, Inc.*, 297 F.3d 528, 532 (6th Cir. 2002) (ratification properly denied when lawsuit was mistakenly brought in the name of the wrong entity in a corporate family and the right entity "was not vigilant in protecting its claims").

Nor can the district court's decision to deny ratification in the presence of an understandable mistake be justified by its finding that ratification would prejudice Keller ISD. It found three sources of prejudice: (1) that Keller ISD was unable to present evidence about PlainsCapital and the Trust at trial; (2) that Keller ISD was deprived of an opportunity to mediate with PlainsCapital; and (3) that PlainsCapital would have been a less sympathetic representative at trial. At least one circuit has held that Rule 17's "liberality" must yield in the face of "undue prejudice" to the opposing party. *See Intown Properties Mgmt, Inc. v. Wheaton Van Lines, Inc.*, 271 F.3d 164, 171 (4th Cir. 2001). We never have. But we need not decide whether prejudice is a necessary part of the Rule 17(a) analysis because the three grounds for prejudice identified by the district court either cannot be blamed on the mistaken decision to assert T.R.'s claims in the name of the Rideaus or are illusory.

First, to the extent that the existence of PlainsCapital and the Trust was concealed from Keller ISD during the discovery process, it is the discovery violation that allegedly hamstrung Keller ISD during trial. Any discovery violation and resulting prejudice, if substantiated, can and should be dealt with through the many remedies available for such violations, not through denying an otherwise proper motion for ratification.

Second, Keller ISD cannot complain that it was not able to settle this lawsuit with PlainsCapital. It had no right to compromise claims and avoid trial that was abridged by the Rideaus' error in naming themselves as T.R.'s representatives. Moreover, there is undisputed testimony that PlainsCapital was kept informed on the progress of the lawsuit and would not have settled without the Rideaus' permission even if named in the complaint.

Third, we disagree that the "prejudice" of having to defend claims against grieving parents rather than a bank representative should be a part of the Rule 17(a) analysis. Jurors in this circuit are routinely instructed to decide the merits of a given case without regard to "passion, prejudice, or sympathy." FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS (CIVIL) § 3.1 (2014). A similar instruction was given in this case. Absent any showing to the contrary, we presume that the jury followed all instructions given, including this one.[10] *See Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 876 (5th Cir. 2013) ("'A jury is presumed to follow its instructions . . . .'") (quoting *Weeks v. Angelone*, 528 U.S. 225, 234 (2000)).

---

[10] Even if we were to entertain this type of "prejudice" argument, it ignores two realities. First, the Rideaus would have been sitting at counsel table even with PlainsCapital asserting T.R.'s claims, as the parents sought damages for their own mental anguish and for T.R.'s past medical expenses. The challenge to the mental anguish claims is addressed in Section V, below. Second, if any person involved in the case did arouse sympathy, it would be T.R.

No. 15-10095

We thus find that the Rideaus offered a reasonable explanation for their mistake in not naming PlainsCapital and that the school district did not suffer undue prejudice from the error even if such a consideration is part of the ratification analysis. While it is rare indeed for ratification to occur so late in a case, it is not unheard of. *See Arabian Am. Oil Co. v. Scarfone*, 939 F.2d 1472, 1477–78 (11th Cir. 1991) (post-judgment ratification); *Sun Ref. & Mktg. Co. v. Goldstein Oil Co.*, 801 F.2d 343, 344–45 (8th Cir. 1986) (post-judgment ratification); *Centennial Ins. Co. v. M/V Constellation Enter.*, 639 F. Supp. 1261, 1264–65 (S.D.N.Y. 1986) (post-trial ratification). Because nothing in the text of Rule 17(a)(3) or our decisions applying it supports the district court's decision to refuse ratification in this case, we find that the refusal to allow ratification was an abuse of discretion as it was in *Magallon* and *Wieberg*.[11]

## V.

The final issue we address is whether the Rideaus are able to recover the damages the jury awarded for their own mental anguish that resulted from the teacher's mistreatment of T.R. The school district again cast this as an issue of standing, and the district court dealt with it as such in dismissing the mental anguish claims for lack of jurisdiction. Once again, we think this is not properly analyzed as a question of Article III standing. The emotional pain

---

[11] Keller ISD urges us to affirm the district court's denial of ratification on an alternative ground: that the Rideaus' and PlainsCapital's motion was untimely. We refuse the invitation to find as an appellate court that the Rideaus were afforded and failed to take advantage of a "reasonable time . . . for the real party in interest to ratify, join, or be substituted into the action," FED. R. CIV. P. 17(a)(3). The real-party-in-interest "objection" identified by Keller ISD, which it contends started the clock on ratification, (1) concerned the Rideaus' "standing" to recover costs which were borne by the Trust, (2) did not rely on the existence of a guardianship, and (3) did not question the Rideaus' capacity to sue on T.R.'s behalf or whether they were the real parties in interest. And PlainsCapital's subsequently filed motion to ratify preceded by nearly two months Keller ISD's motion to dismiss for lack of "standing" that the district court eventually granted.

that results from seeing one's child abused seems to be a sufficiently concrete injury for standing purposes. *Cf. Leibovitz v. New York City Transit Auth.*, 252 F.3d 179, 184 (2d Cir. 2001) (finding that an employee suffered an injury for standing purposes in the form of emotional harm resulting from a coworker's harassment, though she ultimately did not establish a harassment case). Indeed, the number of causes of action in which a person may recover for emotional harm—from many common law claims including, most obviously, intentional inflection of emotional distress to section 1983 claims that rely on common law remedies[12]—supports the notion that emotional harm satisfies the "injury in fact" requirement of constitutional standing.

But suffering an *injury* is one thing; being entitled to a particular type of *damages* is another. *See Tayor v. KeyCorp*, 680 F.3d 609, 613 n.3 (6th Cir. 2012) ("[T]here is a difference between 'actual injury' for purposes of Article III standing and damages."). The latter is where the Rideaus' claims for mental anguish damages fail. *See Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 254 (2010) ("Subject-matter jurisdiction . . . presents an issue quite separate from the question whether the allegations the plaintiff makes entitle him to relief."). And we see no reason for not deciding in this appeal the issue that should have been given a Rule 12(b)(6) rather than 12(b)(1) label.[13]  *See id.* ("Since nothing in the analysis of the courts below turned on the mistake, a remand would only require a new Rule 12(b)(6) label for the same Rule 12(b)(1) conclusion.").

---

[12] *See Memphis Community Sch. Distr. v. Stachura*, 477 U.S. 299, 306–07 (1986).

[13] This is especially true because Keller ISD repeatedly voiced opposition to these claims, first objecting to the relevant instructions and questions in the jury charge and verdict form; then seeking judgment as a matter of law after the presentation of evidence; and finally arguing lack of "standing" in its post-trial motion to re-open discovery. There is thus no question of waiver which is one of the most practical differences between a dismissal based on subject matter jurisdiction and one based on a failure to state a claim.

No. 15-10095

As to the merits of whether the Rideaus can recover mental anguish damages based on the mistreatment of their disabled son, we find that neither the ADA nor the Rehabilitation Act authorizes such claims.  The Rideaus ask us to extend the reasoning of the Supreme Court in *Winkelman ex rel. Winkelman v. Parma City School District*—in which the Court held that parents can assert their own claims under the Individuals with Disabilities Education Act (IDEA) for enforcement of their child's right to a free appropriate public education, 550 U.S. 516, 523–33 (2007)—to these disability statutes.  This proposition has engendered much disagreement among lower courts.  *Compare, e.g., Blanchard v. Morton Sch. Dist.*, 509 F.3d 934, 935 (9th Cir. 2007) (finding that a parent can be a "proper plaintiff" under the ADA and the Rehabilitation Act and citing *Winkelman*) *with, e.g., Hooker v. Dallas Indep. Sch. Dist.*, 2010 WL 4025776, at \*5–\*6 (N.D. Tex. Sept. 13, 2010), *report and recommendation adopted*, 2010 WL 4024896 (N.D. Tex. Oct. 13, 2010) (declining to extend *Winkelman* "because it is too closely tied to the text and structure of the IDEA to apply equally to the ADA and the Rehabilitation Act").[14]  Even if we agreed with the premise that parents have individual rights they can assert under those statutes based on discrimination experienced by their disabled children, no court has ever permitted recovery of the bystander tort-like damages requested here.  *See Chadam v. Palo Alto Unified Sch. Dist.*, 2014 WL 325323, at \*7 (N.D. Cal. Jan. 29, 2014); *Cherry v. Clark County Sch. Dist.*, 2013 WL 3944285, at \*10 (D. Nev. July 22, 2013).  Agreeing with these other courts that have considered this issue, we do not see the statutory basis for doing so.

---

[14] *See also D.N. v. Louisa County Pub. Sch.*, — F. Supp. 3d —, 2016 WL 183926, at \*4 (W.D. Va. Jan. 13, 2016) (describing split in authority and collecting cases); *A.M. ex rel. J.M. v. NYC Dep't of Educ.*, 840 F. Supp. 2d 660, 674–75 (E.D.N.Y. 2012) (same).

No. 15-10095

**\* \* \***

We AFFIRM the dismissal of the Rideaus' individual mental anguish claims.  As to all other claims, we VACATE the judgment entered by the district court in favor of Keller ISD.  We REVERSE the denial of PlainsCapital's motion to ratify the actions of the Rideaus and to be bound by the judgment (for those claims on which the Rideaus brought suit on behalf of T.R.) and REMAND for further proceedings consistent with this opinion.  As part of those further proceedings, Keller ISD will have the opportunity to challenge the now-ratified verdict on the grounds we usually see.