# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

————

No. 16-30339

————

JOSH NORRIS; JILL NORRIS,

   Plaintiffs - Appellees Cross-Appellants

v.

KARRY CAUSEY,

   Defendant - Appellant Cross-Appellee

GARRY CAUSEY,

   Defendant - Cross-Appellee

---------------------------------------------------------------------------

consolidated with 16-30942

JOSH NORRIS; JILL NORRIS,

   Plaintiffs - Appellants

v.

GARRY CAUSEY; KARRY CAUSEY,

   Defendants - Appellees

---------------------------------------------------------------------------

consolidated with 16-31068

JOSH NORRIS; JILL NORRIS,

   Plaintiffs - Appellees

United States Court of Appeals
Fifth Circuit

**FILED**

August 22, 2017

Lyle W. Cayce
Clerk

No. 16-30339
Cons w/ Nos. 16-30942, 16-31068, 16-31069

v.

GARRY CAUSEY,

Defendant - Appellant

-------------------------------------------------------------------------

consolidated with 16-31069

JOSH NORRIS; JILL NORRIS,

Plaintiffs - Appellants

v.

GARRY CAUSEY; KARRY CAUSEY,

Defendants - Appellees

———————————————

Appeals from the United States District Court
for the Eastern District of Louisiana

———————————————

Before REAVLEY, HAYNES, and COSTA, Circuit Judges.

GREGG COSTA, Circuit Judge:

This is yet another case that has its roots in the devastation Hurricane Katrina wreaked on New Orleans. Resilient as the city is, it swiftly began to rebuild. That effort presented attractive opportunities for investors and developers looking to turn a profit. This case involves one such opportunity that went sour.

This lawsuit that followed resulted in a bench trial. One of the defendants appeared at trial to fight the allegations; the other did not and

whether he was properly served is an issue on appeal.  The district court found that both defendants breached their agreement with plaintiffs to purchase, renovate, and sell Katrina-damaged properties.  It held Karry Causey, the defendant who put up a defense, liable for $16,780.  It found the defaulting defendant, Garry Causey, further liable for breach of fiduciary duty and responsible for $94,000.  After that judgment issued, Garry finally appeared and sought to vacate the award alleging improper service.  Both defendants sought to vacate the judgment on the additional ground that they believe the plaintiffs failed to adequately disclose the claim during their bankruptcy.  The district court denied those postjudgment motions and also awarded attorneys' fees and costs against the Causeys.

All these rulings are challenged as both sides appeal.  Plaintiffs contend the district court should have required both defendants to pay the full $94,000 in damages.  Defendants argue that the jurisdictional defects warrant vacating the judgment, that in any event Karry did not breach the contract, and that the fee award is excessive.  We affirm the judgment in all respects as to Karry, but remand for additional factfinding about the attempts to serve Garry.

**I.**

Joshua Norris, a plumber from Michigan, traveled to New Orleans in early 2007 in search of work.  There he met twin brothers Karry and Garry Causey.  The Causeys proposed to Joshua and his wife, Jill, the following investment opportunity: the Norrises would supply funds to purchase hurricane-damaged properties and the Causeys would renovate those properties and sell them at a profit.  That profit would be evenly divided among them.

Garry reduced this plan to writing.  He and the Norrises signed the joint venture agreement.  Karry did not.

3

No. 16-30339
Cons w/ Nos. 16-30942, 16-31068, 16-31069

The agreement divides responsibilities among the parties along the lines of the original understanding.  The Norrises are to finance the project.  Garry is responsible for, among other things, maintaining accounting records, identifying and facilitating the purchase of properties, and negotiating with contractors to obtain the best possible prices. Karry is the project manager.

To fulfill their end of the bargain, the Norrises obtained a home equity loan.  From those funds, they wrote Garry one check for $48,000 and another for $45,000.  This money was supposed to be used for construction on two separate properties.  Garry wired Karry $15,780 of those funds.  The Norrises gave Karry an additional $1,000 for architectural plans he said were needed.

Despite receiving these funds, the Causeys failed to move forward with the renovations.  They instead spent the money on personal items.  After a few months, they also stopped paying the Norrises the interest accumulating on their home equity loan.

Inability to repay that loan led the Norrises to file for Chapter 7 bankruptcy in 2009. The Norrises did not list their potential claim against the Causeys in their bankruptcy schedules.  Before the issuance of the trustee's final report, however, the claim began to appear in interim reports by the trustee as "a potential lawsuit regarding LA property" with an estimated value of $1,000.  The bankruptcy trustee's final report expressly abandons this claim to the Norrises.  *See* 11 U.S.C. § 554(c).  That abandonment became final in 2012 when the bankruptcy court approved the final report and closed the case.

The Norrises subsequently filed this lawsuit against the Causeys.  Garry failed to appear despite various efforts, described in more detail below, to serve him.  The district court thus found Garry in default.  Karry, on the other hand, appeared and actively defended against the Norrises allegations in a one-day bench trial.

4

No. 16-30339
Cons w/ Nos. 16-30942, 16-31068, 16-31069

That trial resulted in the district court's entering default judgment against Garry on breach of contract and fiduciary duty claims and ordering him to pay $94,000 in damages. The district court also found Karry tacitly accepted the contract and likewise breached. But it held him liable for only $15,780—the amount Garry wired him that Karry used for his own benefit.

The Norrises subsequently filed a motion for attorneys' fees and a motion to amend the final judgment. The district court awarded $58,736 in attorneys' fees and costs, holding Garry and Karry solidarily liable for the full amount. And despite disagreeing with the Norrises' arguments for holding Karry solidarily liable for the full damages award, it added $1,000 in damages to account for the check Karry received for architectural plans. Karry filed a notice of appeal. The Norrises filed a cross appeal.

Following the commencement of these appeals, the bankruptcy court in the Eastern District of Michigan reopened the Norrises' case, stating "it appear[s] that Debtors may have intentionally [misled] the Court as to their assets and said asset appears to be an asset of the Debtor's Estate."[1]

After that bankruptcy court activity, and approximately four months after the New Orleans district court issued its final judgment, the Causeys filed separate motions under Rule 60(b)(4) seeking to set aside the judgment as void. This was the first time Garry appeared in the case.

Both Causeys argued that the Norrises did not have standing as failure to disclose the claim in bankruptcy meant abandonment of the claim was

---

[1] The parties report no further action in the bankruptcy court. The docket sheet shows the trustee has since filed one interim report, one semiannual report, and one annual report. *In re Norris*, 2:09-bk-68137 (Bankr. E.D. Mich.). All list this lawsuit as an asset. *Id.* The last report estimates the lawsuit's value at $170,000. *Id.*

5

No. 16-30339
Cons w/ Nos. 16-30942, 16-31068, 16-31069

improper and the trustee should be considered the real party in interest. Garry separately argued that he was not properly served.

The district court agreed with the Causeys that the Norrises were not the proper plaintiffs. But because real-party-in-interest is not a jurisdictional requirement, it denied relief, ordering instead that the trustee could substitute as the plaintiff. The district court further found that Garry was properly served.

## II.

We start our review at the end of the district court litigation, with the denial of the Rule 60(b)(4) motions. We do so because if those motions should have been granted, then the judgment would be void and there would be no need to review the merits.

We first consider the Rule 60(b) ground that would vacate the judgment as to both defendants: the argument that the Norrises lack standing because they did not disclose this claim during their bankruptcy. The district court's ruling on this issue is subject to cross appeals. This is because, although the district court did not void the judgment, it held that the Norrises are not the real parties in interest and the bankruptcy trustee could substitute in. The Causeys argue that the district court did not go far enough; it recognized the real-party-in-interest problem but did not see that through to voiding the judgment. The Norrises contend the district court went too far; whether they or the trustee was the proper party is not a question the court should consider at all in a motion for postjudgment relief. They also argue that the Rule 60 motions were untimely. [2]

---

[2] The Norrises similarly argue the appeals were untimely. But that is not so. Though the timelines are somewhat convoluted given the multiple posttrial motions, the Causeys complied with the deadlines. FED. R. CIV. P. 59(b) (28 days after entry of judgment); *Id.*

No. 16-30339
Cons w/ Nos. 16-30942, 16-31068, 16-31069

**A.**

For starters, there is no timeliness problem with the motions seeking relief from the judgment. Because a "void judgment cannot acquire validity" through the passage of time, Rule 60(b)(4) motions have no time limit. 11 Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, FEDERAL PRACTICE & PROCEDURE, § 2862 (3d ed.); *Jackson v. FIE Corp.*, 302 F.3d 515, 523 (5th Cir. 2002).

Nor is it a problem that Karry's motion was brought after his having appealed the final judgment. A party may seek Rule 60(b) relief after filing a notice of appeal. *Lopez Dominguez v. Gulf Coast Marine & Assoc., Inc.*, 607 F.3d 1066, 1073–74 (5th Cir. 2010). The complication is that a district court may not *grant* the motion and vacate the judgment while an appeal is pending. *Id.* If the district court is inclined to do so, it may notify the litigant who can then ask the court of appeals for a remand. In contrast, the pendency of an appeal does not deprive the district court of the authority it exercised here to deny a Rule 60 motion. *Id.* (citing *Winchester v. U.S. Attorney for Southern Dist. of Texas*, 68 F.3d 947, 949 (5th Cir. 1995)).

**B.**

As the Rule 60(b)(4) motions were timely, we consider whether they established one of the rare defects that renders a judgment void. *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 270 (2010). The "exceedingly short" list of such "infirmities" includes only subject matter

---

60(c)(1) (within a reasonable time after the entry of judgment); FED. R. APP. P. 4(a)(1)(A) (30 days after entry of the judgment). Karry timely filed his appeal of the judgment and both Causeys timely appealed the denials of their Rule 60(b) motions. Those separate appeals are consolidated. We do not understand the Norrises' complaint that the appeals of the Rule 60(b) denials somehow improperly extended Karry's appeal of the underlying judgment. The separate appeals focus on distinct issues: (1) Karry's appeal on his liability and (2) the Rule 60(b) appeals on "standing" and personal jurisdiction.

jurisdiction, personal jurisdiction, "or [ ] a violation of due process that deprives a party of notice or the opportunity to be heard." *Id.* The Causeys try to fit their alleged error into the jurisdictional bucket, characterizing the question whether the Norrises or bankruptcy estate possess the claims against them as one of "standing."

Standing of the constitutional variety—the well-known injury, causation, and redressability trifecta—is a question of subject matter jurisdiction. *Sprint Commc'ns. Co. v. APCC Servs. Inc.*, 554 U.S. 269, 273 (2008) ("Th[e] case-or-controversy requirement is satisfied only where a plaintiff has standing."). But a lack of Article III standing is neither the challenge the Causeys bring nor one they would prevail on. The Norrises' injury is clear: they lost thousands of dollars. They argue that Causeys' diversion of funds caused that injury. And this litigation can redress the loss through damages, as the judgment demonstrates.

The "standing" label is also sometimes placed on the real-party-in-interest challenge the Causeys do assert. *See Wieburg v. GTE Southwest Inc.*, 272 F.3d 302, 306 (5th Cir. 2001) ("Because the claims are property of the bankruptcy estate, the Trustee is the real party in interest with exclusive standing to assert them."); *Rideau v. Keller Indep. Sch. Dist.*, 819 F.3d 155, 163 n.7 (5th Cir. 2016) (noting that "the intermingling of standing and capacity issues is not uncommon") (citing William V. Dorsaneo III, *The Enigma of Standing Doctrine in Texas Courts*, 28 REV. LITIG. 35, 65 (2008)); *In re Unger & Assocs. Inc.*, 292 B.R. 545, 550 (Bankr. E.D. Tex. 2003) ("Frequently, attorneys and courts confuse the concepts of standing with that of capacity to sue and with the real party in interest principle."). Despite this cross labeling, there is a key jurisdictional distinction between a challenge that a plaintiff lacks Article III standing and one that she is not the real party in interest. The

latter presents a merits question: "who, according to the governing substantive law, is entitled to enforce the right?" 6A Wright & Miller, *supra,* § 1543. It is thus like contractual or statutory standing and does not go to a court's subject matter jurisdiction. *See id.* § 1542 (stating that real-party-in-interest "typically is deemed a prudential, rather than a constitutional [issue]"); *Dunn v. Advanced Med. Specialties, Inc.*, 556 F. App'x 785, 789–90 (11th Cir. 2014) (noting that "the principle of real party in interest . . . does not impact the court's subject matter jurisdiction").

The nonjurisdictional nature of real-party-in-interest challenges is evident from the procedure for raising such an objection. An argument that the plaintiff is not the real party in interest is an affirmative defense that must be asserted with reasonable promptness. *In re Signal Int'l, LLC*, 579 F.3d 478, 487–88 (5th Cir. 2009). This typically requires that it be raised ahead of trial. 6A Wright & Miller, *supra,* § 1554. In contrast, a problem with subject matter jurisdiction cannot be waived—that is why it can serve as a ground to void a judgment via Rule 60(b)(4) long after the case ends. In another feature not typical of defects in subject matter jurisdiction, Rule 17(a)(3) states that a case may not be dismissed for a "failure to prosecute in the name of the real party interest until, after an objection, a reasonable time has been allowed" for the proper party to "substitute[ ] into the action." FED. R. CIV. P. 17(a)(3).

Courts have recognized this distinction between Article III standing and real-party-in-interest/capacity issues in holding that an assignment does not erase constitutional injury, *see Cranpark Inc. v. Rogers Group Inc.*, 821 F.3d 723, 730 (6th Cir. 2016) (concluding that "one who sells his interest in a cause of action is not deprived of Article III standing" but "is susceptible to a real-party-in-interest challenge"), and that parents can suffer a financial injury from their child's hardship even when they are not the proper party to sue in

No. 16-30339
Cons w/ Nos. 16-30942, 16-31068, 16-31069

his name, *see Rideau*, 819 F.3d at 163 (recognizing that parents who had Article III standing to sue nonetheless lacked capacity to sue on their child's behalf because a different guardian had been appointed).  More generally, that the Norrises may not ultimately be entitled to the damages awarded does not change that the relief sought redresses an injury they suffered.  *See Sprint*, 554 U.S. at 287 (holding that it is irrelevant that the plaintiff would give all winnings to another party because the sole question is "whether the *injury* that a plaintiff alleges is likely to be redressed through the litigation").  This means that even if the Causeys are correct that the trustee should have brought this suit,[3] that would not entitle them relief under Rule 60(b)(4).  *See Dunn*, 556 F. App'x at 789–90 (rejecting a Rule 60(b)(4) motion challenging real-party-in-interest status for the same reason).

The district court recognized as much in holding that this argument did not raise the jurisdictional defects that support vacating a judgment.  Yet it also ruled that the trustee could replace the Norrises as plaintiffs at this late juncture.  But the inapplicability of Rule 60(b)(4) means the Causeys have invoked no postjudgment vehicle that allows replacing the Norrises with the trustee.  And as we have already explained, challenges to real-party-in-interest status can be forfeited even when raised prior to entry of judgment, such as when a defendant waits to raise the issue until the eve of trial.  *See In re Signal*, 579 F.3d at 487–88; *see also* 6A Wright & Miller, *supra,* § 1554.  So

---

[3] Because of the improper procedural posture in which this real-party-in-interest question was raised, we have no occasion to address whether the Norrises' bankruptcy court disclosure was sufficient or, if it was not, whether the bankruptcy court's abandonment can be undone in this separate litigation.  Judicial estoppel is also sometimes argued when a party pursues a claim that it did not disclose in bankruptcy, *see, e.g.*, *Love v. Tyson Foods, Inc.*, 677 F.3d 258, 261–62 (5th Cir. 2012), but that equitable doctrine does not raise a jurisdictional question.  So the Causeys failure to timely raise estoppel again means we cannot address it.

10

No. 16-30339
Cons w/ Nos. 16-30942, 16-31068, 16-31069

the Causeys' raising this challenge only after the court entered judgment was too late.[4]  The district court should have stopped with its correct observation that an alleged real-party-in-interest problem is not a jurisdictional defect that can overcome the strong interest in finality of judgments.  If the rest of this opinion affirms the judgment, then it remains with the Norrises who acquired this action through the bankruptcy court's express abandonment of it to them.

**C.**

In contrast, Garry does raise an issue that goes to the power of the district court to enter a judgment against him: whether he was properly served. *Thompson v. Deutsche Bank Nat'l Trust Co.*, 775 F.3d 298, 306 (5th Cir. 2014). The Norrises contend this argument also falls outside Rule 60(b)(4) because technically deficient service may not rise to the level of a due process violation. But this argument need not fit in Rule 60(b)(4)'s "due process" category. Deficient service means a court lacked personal jurisdiction over a defendant, and lack of personal jurisdiction is an independent basis for voiding a judgment. *Harper Macleod Solicitors v. Keaty & Keaty*, 260 F.3d 389, 393 (5th Cir. 2001) ("[A] district court *must* set aside a default judgment as void if it determines that it lacked personal jurisdiction over the defendant because of defective service of process.").

We thus must decide whether Garry was served in accordance with Federal Rule of Civil Procedure 4.  Rule 4 allows serving an individual by following either: (1) the law of the state where the suit is brought (Louisiana); (2) the law of the state where service is made (New Mexico); or (3) the methods listed in Rule 4 itself.  FED. R. CIV. P. 4(e)(1).  All three allow substituted

---

[4] Karry suggested a real-party-in-interest problem ahead of trial but decided not to pursue it then.

No. 16-30339
Cons w/ Nos. 16-30942, 16-31068, 16-31069

service.  Such service entails leaving a copy of the summons and complaint at the individual's usual place of abode with someone of suitable age and discretion.  *Id.*; LA. CODE CIV. PROC. ANN. art. 1234; NMRA, Rule 1-004(F)(2).

**1.**

Garry first contends that service was improper because the address in New Mexico where the Norrises tried to serve him was not his place of abode at the time.  The district court's factual finding to the contrary is reviewed for clear error.  *Goetz v. Synthesys Tech., Inc.*, 415 F.3d 481, 483 n.3 (5th Cir. 2005).

There is ample support for the district court's determination.  The New Mexico address appears as Garry's residence in litigation documents, pay stubs, property tax forms, and affidavits.  On top of all this, Karry testified that the New Mexico home is where Garry's wife lives, where Garry raised his kids, and Garry's address as far as he knows.

Garry responds by pointing to his and his wife's affidavits saying he has been living in Denver since 2010—five years prior to service being first attempted in New Mexico.  He notes that a sign outside the home said Garry's mail should be forwarded.  And he offers three bills from 2016 listing a Denver address.

But this effort fails for two reasons.  First, the standard of review means that even if Garry has shown that the location of his place of abode was debatable, we defer to the district court's conclusion.  *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573 (1985).  Garry's argument also assumes he can only have one usual place of abode.  But a person can have two or more such places, provided each contains sufficient indicia of permanence.  *Nat'l Dev. Co. v. Triad Holding Corp.*, 930 F.2d 253, 257 (2d Cir. 1991); *see also* Wright & Miller, *supra,* § 1096.  This is true of the New Mexico residence.  *See Periodical Publishers' Serv. Bureau, Inc. v. Keys*, 1992 WL 298003, at *7 (E.D.

La. Oct. 7, 1992) (concluding a second residence had sufficient indicia of permanence as defendant's "wife resides there, he does not state that he is legally separated or divorced from her, [and] he did actually reside there within three days of service"). The district court did not err in finding that the New Mexico home was a place where Garry could be served.[5]

**2.**

Even if the New Mexico residence is Garry's usual place of abode, another question remains: Was posting the complaint and summons on the door of that residence proper service under Rule 4? The district court held that it was. As support, it cited *Vann Tool Co. v. Grace*, 566 P.2d 93 (N.M. 1977). *Van Tool* says that posting a summons and complaint on a defendant's door is proper if no person is found willing to accept service. *Id.* at 94. That observation, however, relies on an outdated version of the New Mexico rules that allowed service in that manner. *Id.* That rule was revised in 2004 to eliminate "post and mail" service in favor of service at the place of employment.[6] *See UMG Recordings, Inc. v. Montoya*, 2009 WL 1300361, at *2 n.1 (D.N.M. Jan. 30, 2009) (noting the change to Rule 1-004(F)).

---

[5] Garry also argues that the district court erroneously relied on the "outward appearances" doctrine in finding he could be served at the Albuquerque address. *See NLRB v. Clark*, 468 F.2d 459, 464 (5th Cir. 1972) (holding that when a defendant "has in fact changed his residence but to all appearances is still occupying a *former dwelling*, substituted service at the *former dwelling* is proper") (emphasis added). But this misconstrues the district court's reliance on *Clark*. The district court cites it for the proposition that a plaintiff may rely on a defendant's outward representations in concluding a residence is his usual place of abode. Consideration of such representations is not improper. Indeed, we have said that "no hard and fast rule can be fashioned to determine what is or is not a party's 'dwelling house or usual place of abode' within the rule's meaning; rather the practicalities of the particular fact situation determine whether service meets the requirements of [Rule 4]." *Nowell v. Nowell*, 384 F.2d 951, 953 (5th Cir. 1967). The district court's reliance on Garry's outward representations regarding the New Mexico residence was just that: assessing the practicalities of the particular fact situation to determine whether service was proper.

[6] "Rule 1-004(F)(1) formerly provided that if no qualified person was at the usual place of abode to accept service of process, service could be made by posting process at the abode

No. 16-30339
Cons w/ Nos. 16-30942, 16-31068, 16-31069

The Norrises' failure to comply with New Mexico's requirements for service does not end our inquiry. Given the multiples sources that Rule 4 considers in determining if service is proper, we look to whether federal or Louisiana law allows service by posting on the door. The answer turns on what happened the day the complaint was posted on the New Mexico house.

The process server's affidavit says she attempted to serve Garry at his New Mexico residence numerous times. But, she says, neither Garry nor his wife voluntarily opened the door to accept service at any point. She then notes that "[o]n another occasion, Garry Causey's wife yelled through the door that she would not accept service . . . ." The affidavit then says that "[s]ervice was subsequently made on February 2, 2015 by posting the [documents] to the front door."

The district court's reliance on New Mexico's since-repealed service rule—the one allowing posting and mailing even without anyone being present or avoiding service—meant it did not believe it mattered whether Garry's wife yelling through the door and the posting of the documents happened on the same day. So the district court did not make a clear finding as to this timing question. The district court says, for example, that the "process server left a copy of the summons and complaint outside the Albuquerque residence after Garry Causey's wife refused to accept service" without detailing how soon after. It likewise later says that "Garry Causey's wife refused service, so the process server posted the summons and complaint on the front door"—again without clearly stating whether both events took place the same day.

---

and then mailing a copy of the process to the last known mailing address. This alternative method of service has been omitted in the 2004 amendment." NMRA, Rule 1-004(F) (committee commentary). The 2004 Amendment further establishes a "hierarchy of methods of service" which did not before exist, *id.*, meaning that previously a plaintiff did not have to make prior attempts at service before resorting to the "post and mail" method.

No. 16-30339
Cons w/ Nos. 16-30942, 16-31068, 16-31069

It turns out that whether the yelling and posting happened the same day matters a great deal. Leaving a summons and complaint at a residence door, unaccompanied by a refusal to accept service, is not effective service under Rule 4. *See German Am. Fin. Advisors & Trust Co. v. Rigsby*, 623 F. App'x 806, 808 (7th Cir. 2015) ("[L]eaving the papers on the defendant's door is not enough to constitute valid service . . . ."); *Coffin v. Ingersoll*, 1993 WL 208806, at *2 (E.D. Pa. June 11, 1993) (same). Louisiana law likewise does not allow service in that manner. LA. CODE CIV. PROC. ANN. art. 1231. This means that if Garry's wife was not present, let alone refusing service, on the day the process server posted the documents on the door, Garry's service was likely defective.

On the other hand, a defendant's refusal to accept service is not rewarded when the process server announces the nature of the documents and leaves them in close proximity to the defiant defendant. 4A Wright & Miller, *supra,* § 1095 (citing Rule 4(e)(2)(A) and collecting cases). And, contrary to Garry's contention, that doctrine has been extended to cases involving substituted service on a family member. *See Fed. Fin. Co. v. Longiotti,* 164 F.R.D. 419, 421–22 (E.D.N.C. 1996) (concluding service was proper when server left legal documents at doorstep after defendant's wife refused to accept them); *Periodical Publishers' Service Bureau*, 1992 WL 298003, at *6–7 (same); *Conwill v. Greenberg Traurig, LLP*, 2010 WL 2773239, *5 (E.D. La. Jul. 13, 2010) (same). So if Garry's wife was present and refusing service the day of the posting, leaving the summons on the door may have qualified as the permissible "substituted service" of leaving the documents with someone of suitable age and discretion.

Garry urges us to find that his wife's avoidance of service and the posting of the documents on the door were two separate incidents, rule service was improper, and void the judgment. His view of the timing may be the most

15

No. 16-30339
Cons w/ Nos. 16-30942, 16-31068, 16-31069

natural reading of the process server's affidavit.  But because both the affidavit and the district court's findings are susceptible to different interpretations and more evidence may be warranted on this question, the wiser route is to remand to allow the district court to make this finding in the first instance.

If the district court concludes the documents were not posted on the door the same day Garry's wife was home and refused service, it may also engage in additional factfinding about its alternative ruling that service was proper under a "good faith" theory.  We cannot review that holding now for two reasons.  For one thing, the finding that the plaintiffs engaged in good faith efforts to serve Garry may be influenced by the clarification we seek on remand about the extent of the process server's efforts.  For another, the district court seemed to believe a finding of good faith does not require actual notice.  It said only that "the record reveals that Garry *likely* had actual notice of the lawsuit." We have never considered the "good faith" rule that some district courts have adopted and do not do so here given the need for a remand on factual issues. *See, e.g., Conwill*, 2010 WL 2773239, *3–5 ("Where the defendant receives actual notice and the plaintiff makes a good faith effort to serve the defendant pursuant to the federal rule, service of process has been effective.").  But at a minimum the cases adopting that theory seem to permit it only when a defendant had actual notice of the suit.[7]  *See, e.g., Ali v. Mid-Atlantic Settlement Servs., Inc.*, 233 F.R.D. 32, 36 (D.D.C. 2006) (prefacing the rule as with when "[a] defendant receives actual notice").

We therefore remand the service issue for additional factfinding.

---

[7] Although the court did not make a finding that Garry had actual notice, there is evidence to that effect.  Most notably, Garry's brother and business partner (Karry) said there is "[n]o question [Garry] is aware of [this lawsuit]".

No. 16-30339
Cons w/ Nos. 16-30942, 16-31068, 16-31069

### III.

Because we do not find any Rule 60(b) basis to void the judgment entered against Karry, we consider the merits of the district court's rulings as to him. Karry asserts he could not have breached the joint venture agreement because he never accepted it.[8]  The Norrises contend they should have received more damages:  lost profits as well as Karry being held liable for the full amount of their funds that were not invested or returned.

### A.

The district court found that Karry tacitly accepted the joint venture agreement.  Karry fails to show this finding is clearly erroneous.  The trial testimony reveals Karry approached the Norrises about a possible joint venture; had discussions with them about the venture before the agreement was written; agreed to act as the project manager and share in any profits; knew Garry sent the written agreement to the Norrises to sign; and accepted and spent money given to him by Garry that he knew came from the Norrises. This is more than enough to support a conclusion that Karry tacitly consented. LA. CIV. CODE ANN. art. 1843 ("Tacit ratification results when a person, with knowledge of an obligation incurred on his behalf by another, accepts the benefit of that obligation."); *see also Zeller v. Webre*, 17 So. 3d 55, 58 (La. App. 5 Cir. 2009).

### B.

Although it held that Karry was liable for breaching the joint venture agreement, the district court declined to award lost profits as damages for that breach.  Lost profits must be proved with reasonable certainty, meaning they

---

[8] Karry also alleges the bankruptcy court's discharge of the Norrises extinguished their cause of action under the agreement.  His failure to raise this issue below waives it.

17

may not rest on speculation. *Al Smith's Plumbing & Heating Serv., Inc. v. River Crest, Inc.*, 365 So. 2d 1122, 1126 (La. App. 4 Cir. 1978). The district court is given considerable discretion in assessing the amount, if any, of uncertain lost profits. LA. CIV. CODE ANN. art. 1999.

Although the Norrises hoped the joint venture would result in profits, they did not adequately quantify those losses at trial. *White Haute, LLC v. Mayo*, 38 So. 3d 944, 953 (La. App. 5 Cir. 2010) (noting that an expectation that a venture would be profitable alone does not suffice to warrant a lost profits award). As the joint venture was a new enterprise, the Norrises point to Karry's testimony showing he earned profits from redeveloping other properties, and the later redevelopment of one of the properties that is the subject of this litigation. But that evidence, without more, fails to bridge the gap. That is because profiting from a redevelopment depends on many contingencies such as costs, timely construction, and market conditions. *See Al Smith's*, 365 So. 2d at 1125–26 (vacating an award of lost profits because the amount of losses attributable to a plumbing company that delayed a project were indeterminable given that other contingencies may have added to the delay). And the Norrises did not detail the similarity of those undertakings to the one envisaged by the joint venture agreement, let alone the finances of these purportedly comparable projects. As such, the district court did not abuse its discretion in refusing to award lost profits.

**C.**

The last of the contested breach of contract rulings is the district court's determination that Karry is liable for only $16,780 of the $94,000 it awarded in damages to the Norrises.

The Norrises cite two reasons Karry should be liable for the full damages award: (1) although Karry's and Garry's obligations under the agreement are

separate, their respective breaches combined to cause the same loss: the failure of the joint venture; and (2) Karry conspired with Garry to breach the contract and conspirators are liable for all injuries resulting from the conspiracy. Neither argument supports reversal.

The Norrises correctly recite the Louisiana rule holding several obligors solidarily liable—meaning each is responsible for the entire loss—when their breaches combine to cause an item of damages for which each obligor would be entirely liable if she had acted alone. *Stonecipher v. Mitchell*, 655 So. 2d 1381, 1386 (La. App. 2 Cir. 1995). This rule is driven not by the source of the obligations or the nature of the ensuing harm but by the coextensiveness of liability—that is, it applies when each obligor would be independently liable for the entirety of the damages. *See id.* at 1386 ("It is the coextensiveness of the obligations for the same debt, and not the source of liability, which determines the solidarity of the obligation.") (internal citations omitted); *Rivnor Properties v. Herbert O'Donnell, Inc.*, 633 So. 2d 735, 748 (La. App. 5 Cir. 1994) (same). The quintessential case involves subcontractors whose individual shortcomings lead to an entire project being scrapped. An example is two roofers who caused separate defects—one a leaky roof; the other a wrinkly roof—each of which on its own would have required a new roof. *Standard Roofing Co. of New Orleans v. Elliot Constr. Co.*, 535 So. 2d 870, 882 (La. App. 1 Cir. 1988).

This is not true of the liability here. Karry's misconduct—using the $15,780 and $1,000 checks for his own benefit—did not cause all the funds to be misappropriated. *Stonecipher*, 655 So. 2d at 1386 (explaining that the focal point of the solidary liability inquiry is whether the parties' conduct "combined and contributed to cause the same item of damages"); *see also Rivnor*, 633 So. 2d at 748 (same); *Sanders v. Zeagler*, 670 So. 2d 748, 760 (La. App. 3 Cir. 1996)

19

No. 16-30339
Cons w/ Nos. 16-30942, 16-31068, 16-31069

(same), *rev'd in part*, 686 So. 2d 819 (La. 1997).  Put another way, if Garry had followed through on his obligations under the contract, the Norrises' only loss would have been the funds Karry used for personal expenses.  In contrast, had lost profits been proved, the entirety of those damages may have been attributable solely to Karry's misconduct as diverting even a portion of the funds may have prevented a successful renovation.  But the district court did not award lost profits.  So it did not err in holding Karry solidarily liable only for the portion of the damages attributable to his wrongdoing.

The Norrises are also right that Louisiana makes one "who conspires with another to commit an intentional or willful act [ ] answerable, in solido, with that person, for the damages caused by such act."  LA. CIV. CODE ANN. art. 2324(A).  The problem for the Norrises is that they did not ask the trial court to make a finding of conspiracy.  We do not make that type of determination in the first instance, especially one that turns on intent for which credibility plays a big role.  *Homoki v. Conversion Servs, Inc.*, 717 F.3d 388 (5th Cir. 2013), does not say otherwise.  It notes that a failure to obtain a jury finding on damages caused by a conspiracy, which the jury found existed, does not bar imposing solidary liability on the conspirators if the evidence conclusively establishes the damages are the same for the conspiracy and the underlying offense.  *Id.* at 405.  That is quite different than making a conspiracy finding in the first instance on appeal.  Karry thus cannot be held solidarily liable for the $94,000 on account of his purportedly conspiring with his brother.

**IV.**

We lastly address the challenge to the award of attorneys' fees and costs. We review such an award for abuse of discretion, evaluating underlying legal determinations de novo and factual determinations for clear error. *HDRE Bus. Partners Ltd. Grp. v. RARE Hosp. Int'l,* 834 F.3d 537, 539–40 (5th Cir. 2016).

No. 16-30339
Cons w/ Nos. 16-30942, 16-31068, 16-31069

And this being a diversity case involving Louisiana law, we are governed by that state's law on attorneys' fees. *Id.* at 539.

The joint venture agreement provides that "the prevailing party" in any action arising out of the agreement "shall be awarded . . . costs . . . [and] reasonable attorneys' fees." *See Cajun Concrete Servs, Inc. v. J. Caldarera & Co.*, 759 So. 2d 237, 240 (La. App. 5 Cir. 2000) (allowing recovery of attorneys' fees when they are authorized by contract). As the parties who obtained affirmative relief—at least as to Karry whose liability we have affirmed[9]—the Norrises are the prevailing party. *Farrar v. Hobby*, 506 U.S. 103, 111–12 (1992).

Karry argues that even if this is the case, the district court erred in making him liable for the full amount of fees and costs incurred. His arguments on this point are largely conclusory and difficult to decipher. He essentially contends the award is either excessive or unreasonable as to him.[10]

Karry says that holding him liable for the full $58,736.53 in attorneys' fees and costs is excessive because that amount is three-and-a-half times the amount of damages he was ordered to pay. But Louisiana courts frequently

---

[9] Garry's only claim to attorneys' fees and costs depends on him winning his Rule 60(b) motion on remand. In the event that happens, the court can at that time consider his entitlement to fees. And Karry's request for fees was contingent on him prevailing on his arguments we have already rejected.

[10] Karry styles the header in his brief challenging the attorneys' fees award as, "The district court erred by ruling that [he] is solidarily liable for all of the Norrises' costs and attorney fees." But the arguments he advances and the cases he cites all speak to the award being either excessive or unreasonable. Because he neither advances an argument challenging the district court's imposition of solidary liability on fees nor offers case law in support of it, we hold that he forfeited any such claim. *Weaver v. Puckett*, 896 F.2d 126, 128 (5th Cir. 1990) (noting that a failure to adequately brief an issue constitutes abandonment); FED. R. APP. P. 28(a)(8)(A) (requiring appellant's argument to contain "appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which appellant relies").

21

No. 16-30339
Cons w/ Nos. 16-30942, 16-31068, 16-31069

uphold awards exceeding the amount recovered. *Garden Lakes Condo. Homeowners Ass'n v. Perrier*, 66 So.3d 1147, 1148–49 (La. App. 5 Cir. 2011); *South Texas Pioneer Millwork v. Favalora Constructors, Inc.*, 90 So.3d 1092, 1097 (La. App. 5 Cir. 2012); *Health Educ. & Welfare Fed. Credit Union v. Peoples State Bank*, 83 So.3d 1055, 1065 (La. App. 3 Cir. 2011). These awards are upheld when the "amount of time and effort to collect the amount due from defendant warranted the [awards]." *Perrier*, 66 So. 3d at 1149. That is also the case here. The overall amount, well below $100,000, is not on its face excessive for a federal lawsuit that results in a trial (albeit a brief bench trial) and involves some of the challenging legal questions with which this opinion grapples. And the result obtained is only one of ten factors Louisiana courts consider in assessing the reasonableness of a fee award. *State, Dept. of Transp. and Dev. v. Williamson*, 597 So. 2d 439, 442 (1992). Other factors include the amount of money at stake (much more than the amount Karry was ordered to pay given the colorable arguments for lost profits and holding Karry responsible for the full amount misappropriated), the extent and character of the work done, and the number of appearances. *Id.* Just about all of the work the Norrises' attorneys undertook was devoted to the case against Karry as Garry did not appear to defend at trial.[11]   All things considered, the district court did not abuse its discretion in awarding the fees and costs.

---

[11] The posttrial work responding to Garry's Rule 60(b) motion was not included in the fee award. As for the amounts spent attempting to serve Garry ahead of trial, Karry's appeal does not challenge any failure to segregate fees. Rather, it focuses on the fee amount being disproportionate to the damages recovered. That implicates only the question whether the district court abused its discretion in concluding the amount was reasonable. *HDRE Bus. Partners Ltd. Group, LLC v. RARE Hosp. Int'l, Inc.*, 834 F.3d 537, 539–40 (5th Cir. 2016).

No. 16-30339
Cons w/ Nos. 16-30942, 16-31068, 16-31069

**\* \* \***

As to Karry Causey, we AFFIRM the judgment and posttrial order awarding attorneys' fees and costs. As to Garry Causey, we REMAND for the district court to engage in additional findings concerning the propriety of service. We leave it to the sound judgment of the district court to decide whether to allow additional evidence on that issue. Because this is a limited remand, we retain jurisdiction of this appeal and will conduct any additional appellate review that is needed. *See United States v. Cessa,* 861 F.3d 121, 143 (5th Cir. 2017).